## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**DANNY DOMINGUEZ, et al.,**

Plaintiffs,

v.

**JOSE FIGUEROA SANCHA, et al.,**

Defendants.

CIVIL NO. 12-1707 (PG)

## OMNIBUS OPINION AND ORDER

Plaintiffs Danny Dominguez and Elionai Fernandez sued Defendants Minerva Ramos ("ADA Ramos") and Dennis Morales Rodriguez ("Officer Morales") (collectively, "Defendants") for alleged violations of their rights under the Fourth Amendment.[1] Docket No. 1. They specifically claim that Defendants launched a civil rights conspiracy to detain and prosecute Plaintiffs without warrants or probable cause. Plaintiffs now seek compensatory and punitive damages under 42 U.S.C. § 1983. Id. at 20. They also invoke the court's supplemental jurisdiction over their Puerto Rico law claims under the Commonwealth's Constitution and Article 1802 of the Civil Code, P.R. LAWS ANN. tit. 31, § 5141. Id. at 21.

Before the court are Defendants' motions for summary judgment (Docket Nos. 93 and 98) and Plaintiffs' oppositions (Docket Nos. 122 and 135). Defendants filed supplemental

---

[1] Plaintiffs' complaint included other claims that have since been dismissed. See Docket No. 40 (Opinion and Order dismissing official capacity claims against some of the defendants and substantive due process claims under the Fourteenth Amendment); Docket No. 56 (Partial Judgment dismissing claims against Angelica Tirado and Ricardo Rodriguez); Docket No. 101 (Opinion and Order dismissing claims against Guillermo Somoza-Colombani, Jose Figueroa-Sancha and Emilio Diaz-Colon). Only Dominguez's and Fernandez's Section 1983 claims against ADA Ramos and Officer Morales remain.

motions (Docket Nos. 144 and 145) and Plaintiffs replied (Docket Nos. 150 and 151). After a careful review of the motions, the evidence on record and the applicable law, the court **DENIES** Defendants' motions.

## I.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure the court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the nonmoving party. A fact is material if it has the potential of determining the outcome of the litigation." Dunn v. Trs. of Bos. Univ., 761 F.3d 63, 68 (1st Cir. 2014) (internal citation omitted).

The movant has the initial burden of showing that there is no genuine dispute as to any material fact with definite and competent evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (citing FED. R. CIV. P. 56(c)) (identifying record and other supporting materials available at the summary judgment stage). If the movant presents a properly supported motion, the burden then shifts to the nonmovant to show the existence of a genuine factual dispute. Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014) (citing Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). The non-movant must thus "identify[] competent evidence in the record sufficient to create a jury question." Tobin v. Fed. Exp. Corp., 775 F.3d 448, 450-51 (1st Cir. 2014).

At the summary judgment juncture, the court must examine the record as a whole, view the facts in the light most favorable to the non-movant and indulge that party with all reasonable inferences to be derived from the facts. McGrath v. Tavares, 757 F.3d 20, 25 (1st

Cir. 2014); <u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir. 2002). Unsupported and conclusory allegations, on the other hand, should be disregarded. <u>See</u> <u>McGrath</u>, 757 F.3d at 25. The court "may not make credibility determinations or weigh the evidence[,]" as those are jury functions—not those of a judge. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 135 (2000).

## II.    FACTUAL BACKGROUND

The court gleaned the following facts from the parties' summary judgment submissions and, when necessary, from the allegations in the complaint (Docket No. 1). In the interest of thoroughness, the court also adopts and incorporates by reference the factual and procedural background set forth in Section I of the Opinion and Order from September 30, 2014 (Docket No, 40). <u>Dominguez v. Sancha</u>, 50 F. Supp. 3d 117, 121-124 (D.P.R. 2014).

When Mr. Ricardo Rodriguez Tirado skipped bail in New Jersey and fled to Puerto Rico, the bail bond company, Speedy Bailbonds, hired two bounty-hunting Plaintiffs, Dominguez and Fernandez, to locate and bring the fugitive back to New Jersey. **ADA Ramos' Statement of Uncontested Material Facts ("SUMF I") (Docket No. 94) ¶¶ 1-2, 6-7, 9-11.** On May 4, 2011, Plaintiffs arrived in Aguadilla, Puerto Rico, "registered" their firearms at the airport and headed out on their mission. **SUMF I ¶¶ 12 & 14.** They rented a car, a hotel room and, at some point, met with Angel Diaz, an off-duty PRPD officer who would help them locate the fugitive. **SUMF I ¶¶ 20 & 24.**

On May 5, 2011, Dominguez, Fernandez and Diaz drove by the house where they hoped to find Mr. Rodriguez and, lo and behold, saw him there. **SUMF I ¶ 52** Rodriguez's mother, Angelica Tirado ("Ms. Tirado"), was also present. **SUMF I ¶¶ 20 & 22.** Plaintiffs apprehended the fugitive. **SUMF I ¶ 26.** As they were leaving, Mr. Rodriguez asked Ms.

Tirado to contact his attorney, Jose Fernandez Irizarry ("attorney Irizarry"). **SUMF I ¶ 23.** Plaintiffs left with Mr. Rodriguez and took him back to their hotel room. **SUMF I ¶ 26.** Ms. Tirado followed through and called attorney Irizarry, who procured the help of his prosecutor friend, ADA Ramos. **Docket No. 1 at ¶ 57.**

Plaintiffs maintain that ADA Ramos then took a series of actions that led to their arrest. First, she advised Ms. Tirado to file a complaint against the bounty hunters. Then, she called the San Sebastian Police Station and instructed officers to stop the bounty hunters from flying out of the jurisdiction that day. **Id. at ¶¶ 58-62.** The evidence suggests that ADA Ramos also spoke with PRPD Officer Jesus A. Morales,[2] apprised him of Ms. Tirado's impending visit and asked him to draft a criminal complaint. **Docket No. 105-1; Docket No. 136-3 at 24.**

Later that day, Ms. Tirado arrived at the San Sebastian police station and signed the complaint. After the complaint was processed, Defendant – and PRPD Officer – Dennis Morales took over. At the time, Officer Morales was assigned to the Homicide Division and stationed in Aguadilla, near the airport from where Plaintiffs would leave. **Dennis Morales' Statement of Uncontested Material Facts ("SUMF II") (Docket No. 99) ¶¶ 60-62.**

While Plaintiffs waited for their outbound flight, they received a phone call from Officer Morales warning that criminal charges would be filed against them. **SUMF I ¶ 34; SUMF II ¶¶ 40-44.** The bounty hunters went to the local Police Station in Aguadilla to sort matters out, but instead, they were arrested and charged with kidnapping, aggravated

---

[2] To avoid confusion, the court will refer to him as "Officer Jesus Morales."

assault and possession of firearms. **SUMF I ¶ 36; SUMF II ¶ 46.** <u>See also</u> **Docket No. 1 at ¶ 74** (alleging that they were charged with four felonies: kidnapping, aggravated illegal trespassing, illegal possession of a firearm and illegal use of a firearm). Plaintiffs were held overnight. **SUMF II ¶ 49.** Throughout his dealings with Plaintiffs, Officer Morales maintained that the instructions were coming from "above."[3] <u>See</u>, <u>e.g.</u>, **OSUMF I ¶ 57.**

On May 6, Plaintiffs were taken before a magistrate judge for a Rule 6 hearing. The magistrate found probable cause for Plaintiffs' arrest and ordered them to stay under house arrest in Puerto Rico until conclusion of criminal proceedings. **SUMF II ¶¶ 50-52 & 57; Docket No. 1 ¶¶ 73-74, 79.** The preliminary hearing was held 45 days later, from June 20 to June 21, 2011, at which time the court found no probable cause on any of the charges against Dominguez and Fernandez. **SUMF I ¶ 72; SUMF II ¶¶ 58.** The prosecution "appealed" that determination, a move Plaintiffs steadfastly attribute to ADA Ramos. On August 26, 2011, the reviewing court reached the same no probable cause determination.[4] **SUMF I ¶¶ 73-74; SUMF II ¶ 59.** The court notified its final judgment dismissing all charges against Dominguez and Fernandez one month later, on September 27, 2011 to be exact.

## III.    DISCUSSION

### A. Compliance with Local Rule 56

Local Rule 56(c) states that a non-movant's opposing statement of material facts "shall admit, deny or qualify the facts supporting the motion for summary judgment," and

---

[3] Puerto Ricans use this expression when referring to someone with more authority.

[4] The Puerto Rico Rules of Criminal Procedure allow the prosecuting attorney to seek review of the initial "no probable cause" determination. <u>See</u> P.R. LAWS ANN. tit. 34 Ap. II, § 24. In Spanish, this second proceeding is known as a preliminary hearing "en alzada," which roughly translates to "on appeal."

in so doing, shall support each denial or qualification by particularized record citations. L. Cv. R. 56(c) (D.P.R. 2009). If a party improperly controverts the facts, the district court "is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 521 (1st Cir. 2015) (quoting Caban-Hernandez v. Phillip Morris USA, Inc., 486 F.3d 1, 8) (1st Cir. 2007)).

Local Rule 56 does allow an opposing party to provide additional facts, but in a *separate* section. L. Cv. R. 56(c) (emphasis added). The case law on this is clear: "a party may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts." Malave-Torres v. Cusido, 919 F. Supp. 2d 198, 207 (D.P.R. 2013). See also Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 32 (1st Cir. 2010) (upholding the district court's decision to disregard additional facts not included in a separate section). Repeatedly, the First Circuit has held that litigants ignore Local Rule 56 at their peril. Caban-Hernandez, 486 F.3d at 7.

Here, Plaintiffs' opposing statements of fact do not strictly comply with the requirements of Local Rule 56(c) because many of their qualifications and denials border on "additional facts" that, per the summary judgment rules, should have been included in a separate section. Dockets No. 123 & 136. Withal, their opposing statements facts are supported with competent evidence on record, generate uncertainty as to Defendants' factual version, and are crucial to their claims.

At this crossroad, the expressions of Chief Judge Gustavo A. Gelpí regarding a plaintiff's noncompliance with our anti-ferret rules are especially fitting:

> The Court could ignore [these improperly provided facts] because it does not have to ferret through the parties' exhibits under Local Rule 56. See L. CV. R. 56(e) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."). But the Court firmly believes in access to justice, the lack of which is a serious problem in Puerto Rico, and feels uncomfortable completely disregarding these additional facts.

Natal Perez v. Oriental Bank & Tr., 291 F. Supp. 3d 215, 221 (D.P.R. 2018) (citations omitted).

Like Judge Gelpí, having balanced the interests of efficiency and access to justice, the undersigned finds that Plaintiffs opposing statements should be considered when determining whether they have created or identified genuine issues of fact. Withal, "[n]ot every factual conflict necessitates a trial." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (alteration in original). Therefore, the court will identify the disputed facts which clear the materiality hurdle, i.e. those that can potentially affect the outcome of the case. See id. (quoting Parilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997)).

**B. Issues of Material Fact**[5]

It is undisputed that Plaintiffs traveled with their firearms to Puerto Rico. See, e.g., **SUMF I ¶¶ 12-13; OSUMF I ¶¶ 12-13.** However, there are different versions with respect to when and how Dominguez and Fernandez registered their firearms at the airport. For example, ADA Ramos states that "[b]oth plaintiffs had firearms when they arrived to Puerto Rico and they checked both of their firearms with the ID used by plaintiff Dominguez and in

---

[5] The material facts in dispute summarized below are by no means exhaustive. Genuine disputes as to other material facts abound in the record.

his bag, doing only one declaration under Dominguez'[s], who, as a retired policeman, is allowed to carry a firearm across the U.S.A." **SUMF I ¶ 13.**

On the other hand, Plaintiffs submit that they arrived at the Aguadilla airport on May 4 and registered their firearms with a PRPD Officer before heading out. In so doing, Plaintiffs showed the officer their identifications and the bail bond documents "because he wanted to know why we [had] the guns...." **Docket No. 123-1 at 52:21-25.** The officer gave his phone number to Plaintiffs and allowed them to carry on. **Id. at 52-53.**

According to Officer Morales, retired law enforcement officers like Plaintiff Dominguez can transport his firearm across state lines. Oddly enough, and despite the clearance obtained at the Aguadilla airport, Officer Morales later searched Plaintiffs' vehicle and seized both their firearms. **Docket No. 99-4.** Thereafter, Plaintiffs were charged with *inter alia* violations to Puerto Rico's Weapons Act.

### Who answered attorney Irizarry's phone call?

ADA Ramos maintains that Plaintiffs "have mistaken her" for Olga Martinez, then a PRPD employee assigned to the Extraditions Division of the Department of Justice of Puerto Rico ("DOJ-PR"). **SUMF I ¶¶ 61-62, 67.** According to ADA Ramos, Martinez answered attorney Irizarry's phone call on May 5, 2011, and informed him that "no extradition's [sic] proceedings had been initiated with regards to [Mr. Rodriguez]." **SUMF I ¶¶ 61-62.**[6] Defendant reiterates that "[a]t no time whatsoever [ADA] Ramos spoke or communicate with any agent or attorney regarding this matter...." **SUMF I ¶ 68.**

---

[6] ADA Ramos also states that Martinez found an entry in the National Crime Information Center (or "NCIC") for an outstanding warrant from New Jersey against Rodriguez and so informed the caller. But she clarifies that the State of New Jersey "was limiting its intent to extradite from the surrounding states." **SUMF I ¶ 67.**

Plaintiffs rebut the proposed facts with portions of Olga Martinez's deposition testimony, in which she explains that ADA Ramos answered attorney Irizarry's call and later transferred it to her. **OSUMF I ¶¶ 61-62**; **Docket No. 123-6 at 14:17-21.** Officer Jesus Morales' sworn statement not only corroborates this version of the facts, but also shows that after Irizarry talked to Ramos, she called the San Sebastian Police Station and gave a series of directives, which culminated in the arrest and charges against Plaintiffs. **OSUMF II ¶ 61; Docket No. 105-1.**

### *Who "ordered" Plaintiffs' arrest? Who made the decision to file criminal charges?*

ADA Ramos states that "[a]t some point during the evening of May 5th, Plaintiff Fernandez had a telephone conversation with agent and co-defendant Dennis Morales who told him that the police wanted to talk to them because there was a kidnapping charge made against them." **SUMF I ¶ 34.** Plaintiffs "qualify" the proposed fact with an additional fact: Officer Morales told them that "they were being charged...per the instructions of D.A. Minerva Ramos." **OSUMF I ¶ 34.** According to Plaintiffs, when Officer Morales arrested them later that day, he reiterated that he was following ADA Ramos' orders. **OSUMF I ¶ 35.**

ADA Ramos contends that "[i]t was not until the *following day* that ADA Belinda Brignoni contacted [her] at the Extradition Office to inquire into that office's position regarding...arrests made by bounty hunters within the Commonwealth of Puerto Rico." **SUMF I ¶ 69** (emphasis added). She insists that she came into the picture after "ADA Brignoni had already ordered the filing of criminal charges...against Plaintiffs." **SUMF I ¶ 70.** Plaintiffs, again, deny ADA Ramos' narrative. **OSUMF I ¶ 70.** In support, they point to

portions of Olga Martinez's deposition testimony, where she expressly states that ADA Ramos made the decision. **Docket No. 123-5 at 24:22-24.** Plaintiffs further point out that, per Officer Jesus Morales' Sworn Statement, ADA Ramos instructed him to file a complaint for kidnapping because Plaintiffs arrested Mr. Rodriguez without first following the extradition process. In fact, according to that statement, ADA Ramos said that the police had to surveil the airport and arrest Plaintiffs. During their 40-minute conversation, ADA Ramos mentioned that Mr. Rodriguez had a criminal record and there was a warrant for his arrest. **Docket No. 105-1 at 1.**

Based on the foregoing, the court finds that Plaintiffs have shown the existence of triable issues of fact with respect to ADA Ramos' involvement.

### *What about Prosecutor Brignoni?*

On the night of May 5, 2011, Officer Morales called Prosecutor Belinda Brignoni and informed her about what transpired earlier that day. **Docket No. 123-5.** Per Brignoni's version, ADA Ramos called the San Sebastian Police Station and told law enforcement officers that Plaintiffs' actions were illegal. **Id. at 24**. She instructed the officers to prepare a report in anticipation of Ms. Tirado's arrival at the station. **Id. at 18:17-25; 19:18-25; 20:20-25.** Brignoni has also stated that ADA Ramos also made, or at least participated in, the decision to formally charge Plaintiffs with, *inter alia,* kidnapping and possession or use of a firearm. **Id. at 24:23-25; 25-26; 37:1-14; 38:1-5.** Notably, Brignoni explained that although other prosecutors intervened in the case, she was tasked with court appearances. **Id. at 28.**

### Officer Morales' Involvement

On May 5, 2011, Officer Morales was working his 5:00 pm – 1:00 am shift in the Homicide Division in Aguadilla when he received Officer Jesus Morales' call regarding the kidnapping complaint. Defendant then took over the investigation and, as part thereof, interviewed Officer Jesus Morales, Ms. Tirado, attorney Irizarry, Olga Martinez, Mr. Rodriguez and Plaintiffs. See, e.g., **SUMF II ¶¶ 60-64.** But Plaintiffs have pointed to evidence on the record that contradict Officer Morales' proposed facts. Prosecutor Brignoni's deposition testimony, for example, calls into question the investigative steps taken by Officer Morales to ensure the existence of probable cause. Compare **Docket No. 144-1** with **Docket No. 123-5.** Indeed, that testimony discredits Officer Morales' assertion that he consulted the case with Prosecutor Brignoni before placing Plaintiffs in a "holding cell" overnight. See, e.g., **Docket No. 99-4 at 5.**

### The Upshot

A careful review of the convoluted record shows that the parties' versions of the relevant facts, as submitted to the court by each, are in stark contrast with each other. Those identified above sufficiently controvert the legality of Defendants' conduct and cast shade on information available to the officers involved, the investigation carried out before any arrests were made, and the existence of probable cause not only to conduct the warrantless arrests, but also to institute the criminal process. Viewed in the light most favorable to the non-movants, the court further concludes that the record indeed supports reasonable inferences regarding the alleged conspiratorial agreement between the remaining Defendants to violate Plaintiffs' rights under the Fourth Amendment.

## C. The Legal Landscape

### *Section 1983*

Plaintiffs ground their claims on Section 1983, which "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'" Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 924 (1982) (quoting 42 U.S.C. § 1983). To prevail in a § 1983 claim, plaintiffs must establish three elements, to wit, the deprivation of a right, a causal connection between the actor and the deprivation, and state action. See 42 U.S.C. § 1983; Sanchez v. Pereira–Castillo, 590 F.3d 31, 41 (1st Cir. 2009); Concepcion v. Municipality of Gurabo, 558 F. Supp. 2d 149, 162 (D.P.R. 2007) (identifying the subset of elements necessary to establish causation). Furthermore, plaintiffs must show the link between each defendant and the federal right violation. González–Piña v. Rodríguez, 407 F.3d 425, 432 (1st Cir. 2005).

Furthermore, plaintiffs alleging a civil rights conspiracy under § 1983 must show "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (quoting Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988)). Plaintiffs "must prove not only a conspiratorial agreement but also an actual abridgment of some federally-secured right." Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) (citing Earle, 850 F.3d at 844).

Dominguez and Fernandez claim violations of their Fourth Amendment right to be free from "unreasonable searches and seizures." U.S. CONST. amend. IV. Docket No. 1 at ¶¶

102-104. They maintain that Defendants provoked their detention and instituted the criminal prosecution against them without the requisite probable cause. At an earlier stage, the court determined that this was the unusual case in which allegations for both false arrest or false imprisonment *and* malicious prosecution gave rise to a third cause of action: conspiracy to maliciously prosecute. <u>Dominguez</u>, 50 F. Supp. 3d at 125-126. The three causes of action at play are discussed below.

*False Arrest/False Imprisonment[7]*

Simply put, false imprisonment remedies a detention executed without legal process (e.g. an arrest without a warrant or probable cause). <u>Wallace v. Kato</u>, 549 U.S. 384, 389 (2007). Under Puerto Rico law, a claim for false imprisonment arises "when '[a] person, whether or not a law enforcement officer,' tortiously or negligently 'detain[s] or cause[s] the unlawful detention of another person.'" <u>Soto-Cintron on behalf of A.S.M. v. United States</u>, 901 F.3d 29, 33 (1st Cir. 2018) (quoting <u>Ayala v. San Juan Racing Corp.</u>, 12 P.R. Offic. Trans. 1012, 1021 (P.R. 1982)) (citing P.R. LAWS ANN. tit. 31, § 5141). Moreover, Rule 11 of the Puerto Rico Rules of Criminal Procedure allows warrantless arrests based on "reasonable cause." P.R. LAWS ANN. tit. 34a, Ap. II, § 11(c)). So, for a false imprisonment claim to go forward, "it is essential that the individual performing the arrest lacked reasonable cause for believing that the arrestee committed a felony." <u>Soto-Cintron</u>, 901 F.3d at 33 (quoting <u>Diaz-Nieves</u>, 858 F.3d at 684).

---

[7] The Supreme Court has noted that the torts of "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." <u>Wallace v. Kato</u>, 549 U.S. 384, 388 (2007), Like the Supreme Court, this court will "refer to the two torts together as false imprisonment." <u>Id.</u> at 389. <u>See also</u> <u>Diaz-Nieves v. United States</u>, 858 F.3d 678, 684 (1st Cir. 2017) (citing <u>Abreu-Guzman v. Ford</u>, 241 F.3d 69, 75 (1st Cir. 2001)) (noting that under Puerto Rico law, false arrest and false imprisonment claims share the same elements and are thus treated as identical causes of action).

In assessing the merits of such a claim, courts also evaluate the reasonableness of the defendant's actions. This inquiry, although case-specific, usually entails weighing together several factors and circumstances. Among them are the defendant's age, education, experience and the knowledge or information available at the time of the arrest; the plaintiff's or detained person's age, appearance and conduct; and the seriousness of the crime. See id. at 33-34 (citing Ayala, 12 P.R. Offic. Trans. at 1024). Ultimately, liability will be imposed "where, considering all the circumstances, the arresting officer not only makes a mistake but also incurs in negligence." Id. at 34 (quoting Valle v. Commonwealth of Puerto Rico, 157 P.R. Dec. 1, 24 (P.R. 2002)).

*Malicious prosecution*

This court previously explained that "when the period of false imprisonment ends, any unlawful detention thereafter 'forms part of the damages for the entirely distinct tort of malicious prosecution.'" Dominguez, 50 F. Supp. 3d at 125 (quoting Harrington v. Nashua, 610 F.3d 24, 29 (1st Cir. 2010)). Malicious prosecution hems in the assertion that the arrest and detention was the result of the wrongful institution of legal process. Harrington, 610 F.3d at 29.

To prevail on a malicious prosecution claim under Puerto Rico law, a plaintiff must show "(1) that a criminal action was initiated or instigated by the defendants; (2) that the criminal action terminated in the favor of plaintiff; (3) that defendants acted with malice and without probable cause; and (4) that plaintiff suffered damages." Calderon-Lopez v. United States, 337 F. Supp. 3d 99, 103 (D.P.R. 2018) (quoting Diaz-Nieves, 858 F.3d at 688). As to the third element, the plaintiff must show *both* that the defendants acted with malice *and* that they lacked probable cause. Id. "For purposes of malicious prosecution, Puerto Rico

courts equate malice with bad faith." <u>Paret–Ruiz v. United States</u>, 827 F.3d 167, 178 (1st Cir. 2016) (quoting <u>Barros–Villahermosa v. United States</u>, 642 F.3d 56, 58 (1st Cir. 2011)).

### *The Unusual Conspiracy Trifecta*

Finally, a §1983 conspiracy to maliciously prosecute under § 1983 is another cause of action, which "begins before the victim's arrest and ecompasse[s] it." <u>Dominguez</u>, 50 F. Supp. 3d at 125 (quoting <u>Nieves v. McSweeny</u>, 241 F.3d 46, 52 (1st Cir. 2001)) (additional citations omitted). As the court found in its previous Opinion and Order, an alleged conspiracy that involves the fabrication of evidence, false imprisonment and the ensuing malicious prosecution is a viable claim under § 1983. <u>Id.</u> (citing <u>Robinson v. Maruffi</u>, 895 F.2d 649, 654 (10th Cir. 1990)).

### D. Motions for Summary Judgment[8]

In support of their summary judgment motions, Defendants argue that Plaintiffs failed to come forth with evidence showing the existence of a conspiratorial agreement to arrest and prosecute the bounty hunters. For the reasons that follow, the court disagrees.

### *Probable Cause*

Officer Morales' motion for summary judgment rests on the alleged existence of probable cause. <u>See</u> Docket No. 98. He argues that Plaintiffs' claims fail because probable cause supported their arrest, seizure and prosecution. Plaintiffs counter that Officer Morales placed them under arrest without probable cause. Moreover, they point to the fact that their

---

[8] The court will go through the grounds asserted by Defendants in support of their summary judgment motions in no particular order.

arrest resulted not only in immediate imprisonment, but also, a prolonged placement under house arrest pending the criminal proceedings initiated against them. Docket No. 135.

The concurrence of probable cause to support the charges against Plaintiffs would indeed deal a fatal blow to their § 1983 claims. Cf. Hartman v. Moore, 547 U.S. 250, 258 (2006). In the § 1983 context, a finding of probable cause turns on whether the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)). "This is an objective test, and the circumstances should be viewed through the eyes of 'a reasonable person in the position of the officer.'" Petro v. Town of W. Warwick ex rel. Moore, 889 F. Supp. 2d 292, 325 (D.R.I. 2012) (quoting Holder, 585 F.3d at 504).

It is objectively reasonable for officers to seek an arrest warrant "so long as the presence of probable cause is at least arguable." Prokey v. Watkins, 942 F.2d 67, 72 (1st Cir. 1991). However, the facts in controversy in the present case preclude a determination that probable cause was even arguable. The facts summarized in Section III-B pertaining to the people and considerations involved in deciding to arrest, charge and prosecute Plaintiffs (i.e. the instructions that may have been given by ADA Ramos and Prosecutor Brignoni or Olga Martinez's alleged assertion that the bounty hunters were not acting on an outstanding or extraditable warrant), cast much doubt on any reasonable determination of probable cause that could have been made by Officer Morales or any law enforcement officer at the time of the arrests.

It is undisputed that Plaintiffs were both charged with illegal possession of a firearm. Officer Morales concedes that, as a former law enforcement officer, Plaintiff Dominguez could legally carry a firearm at the time of the events in question. See Docket Nos. 136-3 at 60-61; 99-4 at 4-5. Like Dominguez, Plaintiff Fernandez also "checked in" and "registered" his firearm at the airport. See Dockets No. 136-1 at 46-52; 136-2 at 39-40; 136-3 at 36-38, 61. The record nonetheless suggests that Officer Morales neglected to even inquire whether Fernandez had followed the procedures that would allow him to legally carry a firearm in Puerto Rico or consider the fact that he was led to believe so by an on-duty PRPD Officer at the Aguadilla airport. See Docket No. 136-3 at 72-74.

Taking the foregoing into account and viewing the record in the light most favorable to Plaintiffs, the court finds that Officer Morales lacked probable cause (or even reasonable suspicion) to arrest Plaintiffs on the firearm charges. The absence of probable cause for this specific charge is enough for Plaintiffs to survive summary judgment, as their claims against Officer Morales subsist even if probable cause was absent for a charge, but present for another. Mendonca v. City of Providence, 170 F. Supp. 3d 290, 302-03 (D.R.I. 2016) ("In contrast to false-arrest claims, probable cause as to one charge will not bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking."); Goddard v. Kelley, 629 F. Supp. 2d 115, 130 (D. Mass. 2009) ("Where the suspect is prosecuted for multiple offenses, a claim of malicious prosecution can succeed for one or more of the offenses, even if it fails ... for the other offenses."). See also Elmore v. Fulton Cnty. Sch. Dist., 605 F. App'x 906, 915 (11th Cir. 2015); Holmes v. Vill. of Hoffman Estates, 511 F.3d 673, 682 (7th Cir. 2007); Johnson v. Knorr, 477 F.3d 75, 83-84 (3d Cir. 2007); Posr

v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991); Donahoe v. Arpaio, 986 F. Supp. 2d 1091, 1104 (D. Ariz. 2013); Jernigan v. Richard, 907 F. Supp. 2d 998, 1041 (D. Ariz. 2012).[9]

As such, Officer Morales argument that the arrests and prosecutions of plaintiffs were based on findings of probable cause fails to defeat the claims against him at this stage. His request for summary judgment on this ground is, therefore, **DENIED.**[10]

### Malice or Bad Faith

In her motion, ADA Ramos specifically avers that Plaintiffs did not present evidence of a malicious intent or bad faith, and therefore, the claims against her should be dismissed. Docket No. 95 at 17. Her perfunctory argument is unavailing, not least because Plaintiffs' § 1983 claims cover Defendants' actions *before* the arrest, yet malice (or bad faith) is an element of the tort of malicious prosecution. See Section III-C, supra (quoting Calderon-Lopez, 337 F. Supp. 3d at 103).

In this context, malice has been defined as "any wrong or unjustifiable motive[,]" and "may be inferred from a lack of probable cause." Campbell v. Casey, 166 F. Supp. 3d 144, 153 (D. Mass. 2016) (quoting Limone v. United States, 579 F.3d 79, 89 (1st Cir. 2009)). See also Gouin v. Gouin, 249 F. Supp. 2d 62, 71 (D. Mass. 2003) (citation omitted) ("The malice element of malicious prosecution requires that the accuser knew there was no probable cause for the commencement of the action, and that the accuser acted with an improper motive."). For the reasons previously discussed, Plaintiffs' factual version supports the

---

[9] While the cited cases refer to malicious prosecution claims, this court finds their holdings applicable to the § 1983 conspiracy trifecta alleged by Plaintiffs. If the parties disagree, they may request leave to submit further briefing on the matter. But "[t]he court will not do counsel's work." Gonzalez-Bermudez v. Abbott Labs. PR Inc., 214 F. Supp. 3d 130, 156 (D.P.R. 2016) (citation omitted).

[10] To the extent that any of ADA Ramos' summary judgment arguments are grounded on the existence of probable cause, the court rejects them for the reasons already explained.

inference that the officers lacked probable cause to arrest them. They have thus generated factual uncertainty as to the elements of malicious prosecution. See Hernandez v. Colon, Civil No. 16-30089-KAR, 2018 U.S. Dist. LEXIS 88775, at *33 (D. Mass. May 25, 2018) (citing cases) (denying summary judgment as to malicious prosecution claim upon finding that plaintiff's version of events supported the view that the officers lacked probable cause for her arrest).

Consequently, ADA Ramos' request for the dismissal of the claims against her on this ground is **DENIED.**

### E. Immunities

#### 1. Prosecutorial Immunity

Absolute immunity shields "prosecutors performing acts intimately associated with the judicial phase of the criminal process." Goldstein v. Galvin, 719 F.3d 16, 24 (1st Cir. 2013) (internal quotation marks and citations omitted). For example, "[p]rosecutors ... are absolutely immune for actions, taken as advocates for the State, which are closely associated with the judicial process such as initiating and pursuing a criminal prosecution." Knowlton v. Shaw, 704 F.3d 1, 5 (1st Cir. 2013) (citing Burns v. Reed, 500 U.S. 478, 479 (1991)). The protection afforded by this kind of immunity withstands even malicious or corrupt acts taken by officials in the exercise of their prosecutorial functions. See Goldstein, 719 F.3d at 24 (quoting Wang v. N.H. Bd. of Reg. in Med., 55 F.3d 698, 702 (1st Cir. 1995)). Actions taken by prosecutors as investigators, on the other hand, are only protected by qualified immunity. Diaz-Morales v. Rubio-Paredes, 170 F. Supp. 3d 276, 287 (D.P.R. 2016) (citing Diaz-Colon v. Toledo-Davila, 922 F. Supp. 2d 189, 207 (D.P.R. 2013).

ADA Ramos claims she is "absolutely immune from suit because her actions were intimately associated with the judicial phase of the criminal process." Docket No. 95 at 16. Incredibly, ADA Ramos also argues that "at all times relevant to this case, [she] was not acting as a prosecutor[.]" Id. at 9-10. In this regard, her argument is untenable (to say the least). At any rate, Plaintiffs are not seeking damages for actions taken by ADA Ramos in the performance of her prosecutorial duties. Accordingly, ADA Ramos' request for the dismissal of the claims against her on absolute immunity grounds is **DENIED.** See Diaz-Morales, 170 F. Supp. 3d at 287.

### 2. Qualified Immunity

> *[A] public actor's liability under [§] 1983 is not absolute: the doctrine of qualified immunity provides a safe harbor for a wide range of mistaken judgments.*

Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004) (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001)). Or as the Supreme Court says, "[q]ualified immunity 'gives government officials breathing room to make *reasonable* but mistaken judgments about open legal questions.'" Lane v. Franks, 134 S. Ct. 2369, 2381 (2014) (emphasis added) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)).

Although Defendants raised the qualified immunity doctrine at the pleading stage, the lack of factual development prevented the court determining the objective reasonableness of Defendants' actions. Dominguez, 50 F. Supp. 3d at 127-128. The court therefore denied qualified immunity but left the door open for Defendants to press their claim at a later juncture. Predictably, they now move for summary judgment on qualified immunity grounds, so the court will give it a second go.

The qualified immunity inquiry "entails a two-step pavane." <u>Alfano v. Lynch</u>, 847 F.3d 71, 75 (1st Cir. 2017). First, the court considers "whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation," and second, "whether the violated right was clearly established at the time that the offending conduct occurred." <u>Ford v. Bender</u>, 786 F.3d 15, 23 (1st Cir. 2014). The First Circuit second step is itself divisible in two subparts:

> First, the plaintiff must identify either "controlling authority" or a "consensus of cases of persuasive authority" sufficient to signal to a reasonable officer that particular conduct would violate a constitutional right. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." The aim is to ensure that the state of the law is sufficiently specific to give fair and clear warning to government officials. The second sub-part asks whether a reasonable officer in the defendant's position would have known that his conduct violated the established rule.

<u>Morse v. Cloutier</u>, 869 F.3d 16, 23 (1st Cir. 2017) (citations omitted).

Here, the record suggests that the first prong of the inquiry is satisfied. The facts, examined in the light most favorable to Plaintiffs, could support a finding that both Defendants deprived the bounty hunters of their Fourth Amendment rights. The court thus turns to the second step of the inquiry.

Officer Morales' main argument in support of his claim for qualified immunity is that no constitutional violation took place because Plaintiffs' warrantless arrests were supported by probable cause. Plaintiffs counter that there is a dispute of relevant facts regarding the determination or existence of probable cause, which also precludes the court from concluding that Defendant's actions were objective reasonable. To wit, Plaintiffs point out that there are material inconsistencies in the version of the facts provided by the individuals interviewed by Officer Morales after he took over the investigation. They also stress Officer

Morales knew that Plaintiffs had reported their firearms with a PRPD Officer and given him their names, contact information and purpose of their visit, yet eschewed this lead from his investigation. Finally, Plaintiffs maintain that Officer Morales exhibited an obstinate conduct throughout his dealings with Plaintiffs and told them that he was following the instructions of ADA Ramos.

The court notes that none of the parties have mentioned the different reasonableness standards that underlie the probable cause and qualified immunity analyses. See Section III-D, supra (discussing probable cause). The court refuses to do counsel's work. Gonzalez-Bermudez, 214 F. Supp. 3d at 156. Suffice it to mention that the standards are not coterminous, as "qualified immunity requires a 'somewhat lesser showing.'" Nolan v. Krajcik, 384 F. Supp. 2d 447, 467 (D. Mass. 2005) (quoting Cox, 391 F.3d at 31). The lack of proper briefing is enough to cut the analysis short. See Echevarría v. AstraZeneca Pharmaceutical LP, 856 F.3d 119, 139 (1st Cir. 2017) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)) (noting litigants' obligation "to spell out [their] arguments squarely and distinctly, or else forever hold [their] peace").

Alternatively, Plaintiffs have controverted sufficient relevant facts regarding this Defendant's involvement, and therefore, the probable cause question should be submitted to a jury. See Fernandez-Salicrup v. Figueroa-Sancha, 790 F.3d 312, 326 (1st Cir. 2015) (concluding that Fourth Amendment unconstitutional arrest claim against law enforcement officer survived summary judgment because genuine dispute of material facts existed as to the probable cause determination, which also prevented adjudication of the qualified immunity inquiry); Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 8-9 (1st Cir. 2004) (quoting Bolton v. Taylor, 367 F.3d 5, 8 n. 2 (1st Cir. 2004)) (stating that "it is pointless to

submit … [a] probable cause question to the jury at all unless the facts are disputed."); <u>Hernandez</u>, 2018 U.S. Dist. LEXIS 88775, at *21 (accepting plaintiff's account of the events at the summary judgment stage, concluding that facts where insufficient to establish probable cause for plaintiff's arrest, and denying qualified immunity as to plaintiff's § 1983 false arrest claims).

Next, ADA Ramos claims she is entitled to qualified immunity because, in her view, the undisputed facts show she was neither involved in Plaintiffs' arrest nor the prosecutor who decided to pursue charges against them. She maintains that her only job was to give an official opinion as to the local law regarding bounty hunters, "a matter that was not clearly established[.]" Docket No. 95 at 12. Officer Morales echoes this argument. <u>See</u> Docket No. 98 at 17 (stating that "the case law as to the authority of bounty hunters in Puerto Rico is not clearly established….").

Defendants miss the point, for the issue here is whether Plaintiffs had a Fourth Amendment right to be free from unreasonable search and seizures--as opposed to whether they had a right, in their capacities as bounty hunters, to carry on the acts that led to their arrest. The former right –i.e., the Fourth Amendment rights to be seized only on probable cause and to not be subjected to arrest or criminal proceedings based on false evidence or statements made with reckless disregard for the truth—were clearly established at the time that the offending conduct occurred. <u>See</u>, <u>e.g.</u>, <u>Fernandez-Salicrup</u>, 790 F.3d at 326; <u>Vargas-Badillo v. Diaz-Torres</u>, 114 F.3d 3, 5 (1st Cir. 1997) (citing <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964)) (noting that at the time of plaintiff's arrest, "clearly established Fourth Amendment law required that the defendants have probable cause to support Vargas' warrantless arrest"); <u>Hernandez-Lopez v. Pereira</u>, 380 F. Supp. 2d 30, 34 (D.P.R. 2005) (quoting

Camilo–Robles v. Toledo–Davila, 151 F.3d 1, 6 (1st Cir. 1998)) (stating that the Fourth Amendment "right to be free from unreasonable seizure (and, by extension, unjustified arrest and detention) is clearly established").[11]

On this basis, the court finds that Defendants' argument inapposite in the context of the case. Moreover, taking the facts most favorably to Plaintiffs, as is proper at this juncture, the court already found that the facts on which they ground their claims make a constitutional violation for purposes of qualified immunity. Thus, Defendants' request that summary judgment be entered on this ground must be **DENIED.**[12]

### F.  Supplemental State Law Claims

Defendants seek summary judgment on Plaintiffs' Article 1802 and Puerto Rico constitutional. Defendants assume that the federal claims will be dismissed, and therefore, request the court to decline exercising supplemental jurisdiction. However, because Plaintiffs' federal claims survive summary judgment, their claims under Puerto Rico law survive as well. Accordingly, Defendants' request for summary judgment on the supplemental state law claims is **DENIED.**

---

[11] Under the clearly established prong of the test, courts cannot define the law or right at issue too generally, but rather, we must pay particularized attention to the facts and circumstances of each case. See Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 23 (1st Cir. 2016) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 742 (2011)) ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.")

Here, none of the parties identified a more specific right. Plaintiffs did not present a more controlling or persuasive authority applicable to the specific facts and circumstances of this case. These are important components of the analysis and it is incumbent upon the parties to guide the court on the standards governing their claims and defenses.

[12] The denial of the qualified immunity determination is without prejudice.

In moving forward, the parties should become familiar with the First Circuit's decision in the case of Rodriguez-Tirado v. Speedy Bail Bonds, 891 F.3d 38, 41 (1st Cir. 2018), and the Court's expressions with respect to the authority of bounty hunters.

## IV.    CONCLUSION

Granting summary judgment where, as here, material facts at the very core of the legal issues are so hotly contested, would run afoul of the court's discretion in employing the dispositive tool. Indeed, courts may grant summary judgment only when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (a). Consequently, and for the myriad of reasons explained above, Defendants' motions for summary judgment are **DENIED.**

**IT IS SO ORDERED**.

In San Juan, Puerto Rico, February 7, 2019.

S/JUAN M. PÉREZ-GIMÉNEZ
**JUAN M. PEREZ-GIMENEZ**
**SENIOR U.S. DISTRICT JUDGE**